**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

NICHOLAS OUDEKERK,

                Plaintiff,

        -v-                                   5:23-CV-288 (AJB/TWD)

GLENS FALLS POLICE OFFICER DOE 1, *et al.*,

                Defendants.

_____

**APPEARANCES:**                                          **OF COUNSEL:**

NICHOLAS OUDEKERK
Plaintiff, *Pro Se*
DIN #15509
Warren County Correctional Facility
1400 State Route 9
Lake George, NY 12845

MURPHY BURNS GROUDINE LLP         THOMAS K. MURPHY, ESQ.
Attorneys for Defendants
407 Albany Shaker Road
Loudonville, NY 12211

**Hon. Anthony Brindisi, U.S. District Judge:**

<u>**DECISION and ORDER**</u>

## I.      INTRODUCTION

On March 3, 2023, *pro se* plaintiff Nicholas Oudekerk ("plaintiff") filed this 42 U.S.C.

§ 1983 action alleging, among other things, that unnamed officers from the Glens Falls Police

Department ("GFPD") violated his civil rights when they went to his residence and arrested him

on February 18, 2020, after receiving a third-party report that plaintiff had allegedly committed

acts of domestic violence against his partner that night.  Dkt. No. 1.  In an amended complaint,

filed January 30, 2024, plaintiff specifically identified as defendants GFPD Officers Desmond Lyons and Robert Foo (together, "defendants").  *See* Dkt. No. 41-5.

After a somewhat complicated procedural history, detailed in part below, on March 18, 2025, defendants moved under Federal Rule of Civil Procedure 56 for summary judgment on plaintiff's surviving claims for false arrest/false imprisonment and malicious prosecution.  Dkt. No. 63.  While plaintiff sought additional time to respond, Dkt. No. 66, and the Court ultimately extended the deadline, Dkt. No. 68, plaintiff never submitted an opposition.

Because plaintiff filed no opposition, and the window in which he could do so has long since closed, defendants' motion will be considered based on the available submissions without oral argument.

## II.    BACKGROUND

For the following description of the relevant events, the Court relies largely on defendants' statement of material facts, Dkt. No. 63-9 ("Defs.' Facts"), which, for reasons that will be discussed below, is deemed admitted for the purpose of resolving the motion for summary judgment.  The Court also draws upon Officers Foo and Lyons' body-worn camera footage, which they submitted alongside the motion to dismiss, Dkt. No. 63-7 (respectively, "Foo BWC" and "Lyons BWC"), and which is likewise discussed in greater detail below.

At approximately 12:05 a.m. on February 18, 2020, Officers Foo and Lyons responded to a third-party report of an alleged domestic violence incident involving plaintiff and his partner, Brittany Maxwell ("Maxwell"), at the couple's residence.  Defs.' Facts ¶ 1.  The caller, who had identified herself as Maxwell's sister, alleged that plaintiff had choked and punched Maxwell at the residence.  *Id.*

Judging from the body-worn camera footage, plaintiff's residence was an apartment in a multi-unit building.  Foo BWC at approximately 0:10.  From the ground-level porch area, a front door, which was unlocked when defendants responded, opened into what looked like a common hallway area.  *Id.*  The common area included a staircase that led to plaintiff's second-floor apartment, which had its own, separate door.  *Id.*; *accord* Defs.' Facts ¶ 2.

When defendants arrived on February 18, dressed in police uniforms and having driven police vehicles, they approached the front door from the porch.  Defs.' Facts ¶ 2.  Officer Foo knocked loudly several times, the door opened, and Officer Foo repeatedly announced that he was a police officer.  *Id.* ¶ 3.  As the officers entered the building and proceeded up the stairs, Officer Foo continued to clearly announce their presence.  *Id.* ¶ 4; Foo BWC.

By the time defendants reached the top of the stairs, Maxwell had opened the apartment door and said everything was okay and that police were not needed.  Defs.' Facts ¶ 4.  But shortly after that, plaintiff appeared at the doorway and said that he wanted to pursue charges against Maxwell's sister for harassment, since, he claimed, Maxwell's sister had falsely reported him to GFPD.  *Id.* ¶ 5; Foo BWC.  In response, Maxwell reemerged from the apartment and told Officers Foo and Lyons that her sister "had a reason" to summon the police.  Foo BWC.

Some crosstalk ensued.  But the gist of what happened next is the following: plaintiff told the officers that Maxwell's sister had called GFPD to claim, falsely, that he had put his hands on Maxwell.  Foo BWC at approximately 01:30.  When Officer Foo asked whether plaintiff had in fact done so, he responded, "Well, I don't know."  *Id.*

For her part, Maxwell told the officers about an alleged incident of domestic violence that had taken place at a department store sometime in the then-recent past, and further explained

that, in the apartment that night, plaintiff had thrown items at her, "choked [her]," and "slammed [her] against" an object.  Foo BWC at approximately 02:15; *see also* Defs.' Facts ¶ 8.

Around this time, all four—plaintiff, Maxwell, and Officers Foo and Lyons—went inside the apartment.  *See* Foo BWC at approximately 02:50.  No one objected to the officers' entry or continued presence there.  *Id*.  Also around this time, plaintiff and Maxwell began to verbally argue.  *Id*.  The officers separated them and spoke with each party separately, with Officer Foo and Maxwell moving to the kitchen, and Officer Lyons and plaintiff going back to the hallway area outside the apartment.  *Id*.; Defs.' Facts ¶ 7.

Once apart from plaintiff, Maxwell expanded on the events that preceded her sister's calling GFPD.  Defs.' Facts ¶ 8.  She explained that plaintiff had grabbed her by the throat, choked her, picked her up, shook her, and dropped her.  *Id*.  Maxwell further stated that she had tried to leave, and plaintiff blocked her from doing so.  *Id*.; Foo BWC at approximately 03:30.

When Officer Foo asked Maxwell whether she could breathe during the alleged choking, she responded "barely," and indicated that her neck still hurt.  Foo BWC at approximately 04:20.  Officer Foo shone a flashlight on Maxwell to observe any injuries, and she gestured toward red marks on the left side of her neck and her right forearm, where she claimed plaintiff had hit her with a broom.  *Id*.; *see also* Defs.' Facts ¶ 8.

Shortly afterwards, Maxwell led Officer Foo to her and plaintiff's bedroom, where a piece of fabric covered part of the wall.  Foo BWC at approximately 06:40.  Maxwell moved the fabric to reveal a large hole in the wall, which she claimed plaintiff had caused previously.  *Id*.  During her interactions with Officer Foo, Maxwell repeatedly stated that she wanted plaintiff removed from the residence and sought to obtain an order of protection.  *See* Defs.' Facts ¶ 11.

Based on these events, Officer Foo determined there was probable cause to arrest plaintiff on suspicion of violating New York State Penal Law §§ 121.11, criminal obstruction of breathing or blood circulation, and 135.05, unlawful imprisonment, both class-A misdemeanors. Defs.' Facts ¶ 10. Officer Foo went to the hallway and informed plaintiff—whom Officer Lyons had handcuffed—that he was being arrested on these charges. Foo BWC at approximately 08:30.

Officer Lyons led plaintiff outside to the patrol car, and then to the police station for processing. Lyons BWC at approximately 08:00; Defs.' Facts ¶ 12. Plaintiff was held at Warren County lockup until his arraignment in Glens Falls City Court at 9:00 a.m. the same morning. Defs.' Facts ¶ 13.

Maxwell subsequently declined to participate in plaintiff's prosecution on the charges stemming from this incident. Defs.' Facts ¶ 14. Ultimately, on October 29, 2020, plaintiff pleaded guilty in Glens Falls City Court to other state charges, in satisfaction of both the February 18 case and the other, unrelated case. *Id.* ¶ 15.

On March 3, 2023, while incarcerated at the Auburn Correctional Facility in Auburn, New York, plaintiff filed the original complaint in this action, alleging that two unnamed GFPD officers and an unnamed Warren County prosecutor violated his Fourth, Eighth, and Fourteenth Amendment rights, in essence, by pursuing the charges against him despite what he described as a lack of evidence at the time of his arrest and afterwards. *See generally* Dkt. No. 1.

Alongside his complaint, plaintiff moved to proceed *in forma pauperis* ("IFP Application"). Dkt. No. 2. This case was initially assigned to Chief U.S. District Judge Brenda K. Sannes, who referred the complaint to Judge Dancks for an initial review. *See* Dkt. No. 5.

On May 5, 2023, Judge Dancks granted plaintiff's IFP Application and conducted an initial review of the original complaint. Dkt. No. 10. There, Judge Dancks concluded that plaintiff's Fourth Amendment claims alleging false arrest/false imprisonment and malicious prosecution against the then-unnamed officers in their individual capacities survived initial review, but the remainder, including plaintiff's official-capacity claims against the officers and all claims against the unnamed prosecutor, did not. *Id.*

On May 26, 2023, Chief Judge Sannes adopted Judge Dancks' recommendations and added GFPD Chief Jarred Smith as a defendant for the purposes of service and discovery only. Dkt. No. 11. Smith answered the complaint on August 4, 2023. Dkt. No. 17.

Some confusion about plaintiff's address followed. *See, e.g.*, Dkt. Nos. 18 (notice of change of plaintiff's address, which he filed via MFT), 21 (notice that G.O. 25 filing order had been returned as undeliverable), 25 (same, regarding Chief Judge Sannes' decision and order). However, a properly filed notice regarding plaintiff's new address seemed to solve this problem, at least temporarily. Dkt. Nos. 28, 31.

By January 30, 2024,[1] plaintiff filed an amended complaint, which is the operative pleading. Dkt. No. 41. Officers Foo and Lyons answered on July 17, 2024. Dkt. No. 55.

Confusion regarding plaintiff's address arose again, apparently due to his release from custody and later reincarceration at the Warren County Correctional Facility ("WCCF"). *See* Dkt. Nos. 57 (notice that scheduling order mailed to WCCF was returned as undeliverable) 58

---

[1] The Court uses this phrasing because, earlier that month, plaintiff had attempted to submit an amended complaint reflecting the surviving claims, the surviving defendants' identities, and the different forms of relief he sought, *see* Dkt. No. 39, which Judge Dancks denied without prejudice as incomplete, Dkt. No. 40. Additionally, while the deadline for any amended pleadings had been January 5, 2024, and plaintiff submitted his first request for leave to file an amended complaint after that date, Judge Dancks nevertheless reviewed and accepted a subsequent proposed amended complaint afterwards, given plaintiff's *pro se* status. Dkt. Nos. 43, 44.

(text order reminding plaintiff of obligation to keep the Court informed of his address), 60 (letter stating plaintiff had returned to WCCF custody).

In any event, on March 18, 2025, defendants timely filed their motion for summary judgment, which is presently before the Court.  Dkt. No. 63.  This submission included, among other things, the body-worn camera footage discussed elsewhere in this decision, Foo BWC & Lyons BWC, as well as this judicial district's standard notice to *pro se* litigants concerning the consequences of failing to respond to a motion for summary judgment, Dkt. No. 63-1.  The latter was also mailed separately to plaintiff, along with a clear notice of the deadline for his response, which had been set for April 8, 2025.  Dkt. No. 64.

On April 3, 2025, plaintiff submitted a letter motion asking the Court to suspend the briefing schedule.  Dkt. No. 66.  On April 7, 2025, the Court denied that request, but *sua sponte* extended plaintiff's deadline to respond to the motion for summary judgment to May 5, 2025.  Dkt. No. 68.  Plaintiff submitted no opposition, either by the extended deadline or afterwards.

## III.    LEGAL STANDARD

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  An issue of fact is material for this the purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In assessing whether any genuine disputes of material fact remain, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the

nonmoving party." *Ward v. Stewart*, 285 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation

omitted). But there is no genuine issue for trial "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## IV.    DISCUSSION

### A. Threshold Matters

Before reaching the merits of plaintiff's § 1983 claims against Officers Foo and Lyons,

the Court addresses plaintiff's *pro se* status, his failure to oppose summary judgment, the Court's

resulting approach to defendants' statement of material facts, and the Court's treatment of the

body-worn camera footage that forms part of the record in this case.

#### 1. Plaintiff's *Pro Se* Status

Plaintiff is *pro se*. In other words, while plaintiff has repeatedly sought to have counsel

appointed, *see* Dkt. Nos. 5 (initial motion for assignment of counsel), 10 (initial denial without

prejudice), 23 (second motion for assignment of counsel), 24 (second denial without prejudice

and admonishment that subsequent such motions must include evidence of plaintiff's

independent efforts to obtain counsel), 33 (third motion for assignment of counsel), 42 (third

denial without prejudice), 67 (fourth motion for assignment of counsel), he is representing

himself in this action.

As relevant to this motion, the practical effect of plaintiff's *pro se* status is that the Court

must hold his filings to a less exacting standard than those a lawyer may have drafted. *See*

*Ahlers v. Rabinowitz*, 64 F.3d 53, 60 (2d Cir. 2012). The Second Circuit has explained that *pro*

*se* filings must be "construed liberally" with "special solicitude" and interpreted to raise the

strongest claims they suggest. *Hogan v. Fischer*, 738 F.3d 509, 519 (2d Cir. 2013). "This is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Such is the case here, where plaintiff claims defendants violated his rights under the Fourth Amendment.

### 2. Plaintiff's Failure to Oppose Summary Judgment

Nevertheless, as discussed above, plaintiff never submitted an opposition to defendants' motion for summary judgment. But his failure to do so does not necessarily mean that the Court must grant defendants' motion. *See D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006). That is because, in general, when nonmovants fail to respond, movants still must carry their ordinary burden of production, meaning they must show that the undisputed material facts warrant judgment as a matter of law. *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). And reviewing courts still must faithfully apply the summary judgment standard. *Id.*

This general rule also applies to unrepresented parties. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (per curiam). But when confronting situations like this one, district courts must also ensure that a *pro se* plaintiff has "actual notice, provided in an accessible manner, of the consequences of [his] failure to comply with the requirements of Rule 56." *Irby v. N.Y. City Transit Auth.*, 262 F.3d 412, 414 (2d Cir. 2001); *see also Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620 (2d Cir. 1999) ("[I]t is not obvious to a layman that when his opponent files a motion for summary judgment supported by affidavits he must file his own affidavits contradicting his opponent's if he wants to preserve factual issues for trial.").

This notice can come from either the district court or the movant. *See, e.g.*, *M.B. v. Reish*, 119 F.3d 230, 232 (2d Cir. 1997). It must be "provided in an accessible manner," *Irby*, 262 F.3d at 414, include a "short and plain statement in ordinary English" that explains "the nature and consequences of summary judgment," *McPherson v. Coombe*, 174 F.3d 276, 281 (2d Cir. 1999), and advise the nonmovant to "set forth all available evidence demonstrating a genuine dispute over material facts," *Sawyer v. Am. Fed. of Gov't Emps.*, 180 F.3d 31, 35 (2d Cir. 1999) (citation omitted). Failing to provide this notice constitutes reversible error unless the record obviously shows that a *pro se* litigant "has demonstrated a clear understanding of the nature and consequences of a summary judgment motion." *Jova v. Smith*, 582 F.3d 410, 414 (2d Cir. 2009) (per curiam).

In this case, plaintiff received actual notice. Defendants' motion to dismiss, filed March 18, 2025, included—as the first attachment, appearing even before a memorandum outlining the legal justifications for their positions—this judicial district's standardized "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion" form (the "Notice"). Dkt. No. 63-1. The Notice states, in bold text, that failing to respond could lead the Court to "dismiss some or all of [plaintiff's] claims" and outlines what a proper response would require. *See id.* On March 19, 2025, Court staff also mailed plaintiff a copy of the Notice in a separate, two-page letter advising him of defendants' motion. Dkt. No. 64. Considering plaintiff later moved for additional time to respond to the motion, Dkt. No. 66, he was clearly aware of the motion, its contents, and the initial deadline to respond to it.

Therefore, it is beyond dispute that in this case plaintiff received the benefit of the procedural safeguard concerning actual notice to which *pro se* litigants are entitled.

### 3. Defendants' Statement of Material Facts

The special solicitude due to *pro se* plaintiffs extends to the analysis of whether genuinely disputed material facts warrant a trial. The summary judgment procedure generally requires the parties to identify such facts, a process that, at least in this judicial district, requires each side to submit a document known as a statement of material facts. *See* N.D.N.Y. L.R. 56(a) & (b). Under our Local Rules, the movants must submit the undisputed material facts that entitle them to judgment as a matter of law, and the nonmovant must respond with a matching document that either admits or denies each material fact the movant has offered. *Id.* A reference to the record evidence making the dispute "genuine" must accompany each denial. *Id.*

Because *pro se* litigants may find it difficult to follow this rule, reviewing courts usually favor function over form in assessing their statements of material facts. Sometimes, this entails an independent review of the underlying record to determine whether a genuine factual dispute exists. *See, e.g.*, *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (recognizing district courts' "discretion [] to conduct an assiduous review of the record"), *abrogated on other grounds by Gross v. FBI Fin. Servs., Inc.*, 557 U.S. 167 (2009).

But Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (collecting cases).[2] Instead, a reviewing court will typically carefully review what a *pro se* litigant has offered to try to determine whether a trial may be

---

[2] Even where a *pro se* litigant has failed to file an opposition, courts must treat verified complaints as affidavits for summary judgment purposes. *See, e.g.*, *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). But plaintiff's amended complaint is not verified. Dkt. No. 41. And even if it were, its nonconclusory claims would not put any material facts in genuine dispute. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, *materiality* runs to whether the dispute matters, *i.e.*, whether it concerns facts *that can affect the outcome* under the applicable substantive law" (emphases added).).

warranted on any of the claims. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally or factually appropriate.").

Still, a litigant's *pro se* status provides no wholesale exemption from procedural rules. *See, e.g.*, *Edwards v. I.N.S.*, 59 F.3d 5, 8 (2d Cir. 1995). These include the procedural rules governing an opposition to summary judgment. *See, e.g.*, *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). And where the nonmovant fails to oppose a motion for summary judgment, the reviewing court may deem admitted the properly supported facts in the movant's statement of material facts to assess the motion. N.D.N.Y. L.R. 56.1(b). Indeed, courts in this circuit regularly apply this rule to cases involving *pro se* litigants. *See, e.g.*, *DeJesus v. Malloy*, 531 F. Supp. 3d 650, 658 (W.D.N.Y. 2021); *Martin v. Town of Simsbury*, 505 F. Supp. 3d 116, 125 (D. Conn. 2020); *Barnes v. Malavi*, 412 F. Supp. 3d 140, 142 n.3 (E.D.N.Y. 2019); *Ogalo v. N.Y. State Thruway Auth.*, 972 F. Supp. 2d 301, 305 (N.D.N.Y. 2013).

Thus, the Court deems admitted the properly supported material facts in defendants' statement of material facts, Defs.' Facts, in assessing the motion for summary judgment.

### 4. The Body-Worn Camera Footage

The final preliminary matter is the body-worn camera footage from plaintiff's arrest that Officers Foo and Lyons submitted alongside their motion to dismiss, as discussed above. In a case called *Scott v. Harris*, the Supreme Court held that courts should consider video evidence constituting part of the record in assessing whether genuine material issues of fact exist. 550 U.S. 372 (2007). The Fifth Circuit has since explained that *Scott* "empowers a district court to

disregard testimony that is at odds with video evidence." *Orr v. Copeland*, 844 F.3d 484, 491 (5th Cir. 2016).

Defendants cite the footage extensively in support of the contentions they make in their statement of material facts. *See generally* Defs.' Facts. The Court has reviewed the footage to confirm whether it supports those contentions. *See, e.g.*, *Congregation Rabbinical Coll. Of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) (collecting cases explaining courts should disregard factual assertions lacking support in the record).

The footage supports defendants' version of events as offered in their statement of material facts. *See* discussion *infra*. Both together and individually, the recordings from defendants' body-worn cameras depict Officers Foo and Lyons arriving on the scene, announcing their presence, entering the building, encountering plaintiff and Maxwell, speaking with both parties, receiving further information from Maxwell that provided probable cause that plaintiff had, in fact, obstructed Maxwell's breathing and prevented her from leaving the residence earlier that evening, arresting plaintiff, and transporting him to the police car.

So, to the extent that the body-worn camera footage shows events relevant to the instant motion, the Court has considered whether it tends to establish any genuine disputes over the material facts that might warrant a trial. It does not.

## B. The Merits

Turning finally to the merits, plaintiff brings his claims under 42 U.S.C. § 1983. "Section 1983 creates a cause of action based on personal liability and predicated upon fault." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1230 (1997). While the precise state-of-mind requirement varies, *Daniels v. Williams*, 474 U.S. 327, 330

(1986), a § 1983 claim holds an individual personally liable for the role his acts or omissions played in violating someone's constitutional rights, *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Therefore, "[t]o establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023).

### 1. False Arrest/False Imprisonment

"A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012). New York law, in turn, "requires that the plaintiff show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Id.* (quoting *Broughton v. State of N.Y.*, 37 N.Y.2d 451, 456 (1975)).

The elements of a false imprisonment claim are "substantially the same" as those of a false arrest claim. *Hernandez v. United States*, 939 F.3d 191, 199 n.3 (2d Cir. 2019) (citing *Burgio v. Ince*, 913 N.Y.S. 2d 864, 865 (4th Dep't 2010)). The Court thus evaluates plaintiff's claims concerning false arrest and false imprisonment in this case as one unified claim.

The record clearly establishes, and defendants do not dispute, that Officers Foo and Lyons arrested plaintiff on February 18, 2020, a process that—broadly speaking—entailed going to his residence, restraining him, transporting him to a police vehicle, and driving him to a police station. *See* Defs.' Facts ¶¶ 10–13. Nothing in the record suggests plaintiff was either unaware of or a willing participant in his own arrest. Accordingly, the Court will consider the first three elements of this claim satisfied.

Importantly, though, a plaintiff cannot satisfy the fourth element, concerning privilege, if probable cause supported his arrest. *Hernandez*, 939 F.3d at 199 ("'For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause.'" (quoting *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759 (2016))); *see also Harrison v. Cnty. of Nassau*, 804 F. App'x 24, 27 (2d Cir. 2020) (summary order) ("[P]robable cause to arrest is a complete defense to . . . a [false arrest] claim brought under either § 1983 or New York law.").

"Probable cause is established when the arresting officer[s have] knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Harrison*, 804 F. App'x at 27. In evaluating whether probable cause exists, "[a] court 'must consider [only] those facts available to the officer at the time of the arrest and immediately before it.'" *Id.* (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).

Construing his claims liberally, and using the amended complaint as a guidepost, plaintiff appears to contend that Officers Foo and Lyons lacked probable cause to arrest him on charges of criminal obstruction of breathing and unlawful imprisonment. *See* Dkt. No. 41-2 at 1–2. Among other things, for example, plaintiff alleges that "there were no marks consistent with the police report of me choking and shaking [Maxwell] with both hands" and that there was "no medical record, testimony, nor any evidence supporting guilt." *Id.* (cleaned up). He further states that Maxwell's sister was unaware of any information tending to incriminate him when she called the police, and that Maxwell later declined to cooperate in the prosecution. *See id.* at 1–3. So, as plaintiff summarizes, "any and all evidence supported [plaintiff's] innocence," and "no evidence supported conviction nor guilt." *Id.* at 3(cleaned up).

Defendants, meanwhile, argue that probable cause to arrest plaintiff arose because Maxwell herself told Officer Foo that plaintiff had "choked her," "grabbed her around the throat with his hands, choked her on the couch, . . . picked her up, shook her and then dropped her," and that plaintiff had later prevented her from leaving the residence, both by obstructing her exit and through threats, and because Officer Foo "observed red marks on Maxwell's neck," which she had attributed to plaintiff's choking her.  Dkt 63-10 at 6–7.

While the Court recognizes that proving a negative, *i.e.*, that probable cause did not support plaintiff's arrest, can be difficult, the record contradicts plaintiff's assertions.  On top of defendants' statement of material facts—which, again, the Court treats as admitted, and which, naturally, supports defendants' position, Defs.' Facts ¶ 8—the footage shows that Maxwell told officers about plaintiff's choking her and blocking her exit, and it shows the marks on Maxwell's neck that she attributed to the alleged choking, *see generally* Foo BWC & Lyons BWC.  At the very least, the record clearly demonstrates that probable cause supported plaintiff's arrest on the two misdemeanor charges.  *See Singer*, 63 F.3d at 119 ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity.") (collecting cases).

Because plaintiff cannot satisfy all four elements of false arrest/false imprisonment as a matter of law, no reasonable factfinder could return a judgment in his favor.  Therefore, defendants' motion for summary judgment as to this claim must be granted.

### 2. Malicious Prosecution

"To state a 42 U.S.C. § 1983 claim for malicious prosecution, a plaintiff must plead both 'a violation of his rights under the Fourth Amendment' and 'the elements of a malicious prosecution claim under state law.'" *Dettelis v. Sharbaugh*, 919 F.3d 161, 163 (2d Cir. 2019) (quoting *Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010)). New York law requires that a plaintiff alleging malicious prosecution prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) *lack of probable cause for commencing the proceeding*; and (4) actual malice as a motivation for the defendant's actions." *Id.* at 163–64 (emphasis added).

The Court incorporates its analysis of probable cause here. So, even if the record contained enough evidence to establish all three other elements, the presence of probable cause to arrest plaintiff on the two misdemeanor charges means this claim must fail, too. Accordingly, defendants are also entitled to summary judgment with respect to plaintiff's malicious prosecution claim.

### 3. Remaining Matters

Because the record prevents plaintiff from establishing false arrest/false imprisonment or malicious prosecution as a matter of law, the Court need not separately evaluate defendants' arguments concerning either qualified immunity, Dkt. No. 63-10 at 8–10, or the applicable statute of limitations in this case, *id.* at 10–13.

Further, because the remaining claims do not warrant a trial, the Court can identify no reason to grant plaintiff's most recent request for the assignment of counsel. Dkt. No. 67.

## V.    CONCLUSION

Even considered in the light most favorable to plaintiff and accounting for his *pro se* status, the record in this case would not permit a rational trier of fact to return a verdict in his favor on either his false arrest/false imprisonment claim or his malicious prosecution claim.

Therefore, it is

ORDERED that

1.  Defendants' motion for summary judgment (Dkt. No. 63) is GRANTED;

2.  Plaintiff's letter motion for assignment of counsel (Dkt. No. 67) is DENIED; and

3.  Plaintiff's amended complaint (Dkt. No. 41) is DISMISSED with prejudice.

The Clerk of the Court is directed to terminate the pending motions, enter a judgment accordingly, and close the file.

**IT IS SO ORDERED.**

Dated:  December 19, 2025
        Utica, New York.

Anthony J. Brindisi
U.S. District Judge